BURLESON *v.* BLAIR.

1. FRAUD—FRAUDS, STATUTE OF—REPRESENTATIONS AS TO CREDIT OF ANOTHER.

> In an action for the value of certain bonds sold to plaintiff by defendant by reason of alleged fraudulent representations as to their value, the statute of frauds (3 Comp. Laws 1915, § 11983) requiring representation or assurance as to the credit, etc., of any other person to be in writing and signed by the party to be charged, in order to sustain an action thereon, has no application if defendant was the owner of said bonds or if he profited by the transaction.

2. SAME—EVIDENCE—SUFFICIENCY—QUESTION FOR JURY.

> Where plaintiff's testimony as to defendant's representations that he was the owner of the bonds was corroborated, the court below was in error in holding that there was no proof to go to the jury on that question.

3. SAME—FRAUDS, STATUTE OF—APPLICABILITY—PERSONAL PROFIT.

> Where defendant, the cashier of a bank at the time he sold the bonds for a brokerage firm, had an arrangement with said firm, of which he was a stockholder, to become its treasurer and director and take charge of the sale of bonds, in the near future, at an advance of salary over what he was receiving, and later received the position which he desired, *held,* to be such profit as to render inapplicable said statute of frauds, although he did not receive a direct commission.

Error to superior court of Grand Rapids; Dunham, J. Submitted January 10, 1919. (Docket No. 26.) Decided October 6, 1919. Rehearing denied December 23, 1919.

Assumpsit by Willard M. Burleson against Hugh Blair for the purchase price of certain stock. Judgment for defendant *non obstante veredicto.* Plaintiff brings error. Reversed, and case remanded with directions to enter judgment on the verdict with leave to renew motion for new trial if desired.

*Louis T. Herman* (*Charles E. Ward*, of counsel), for appellant.

*Butterfield & Keeney* and *Myron H. Walker* (*Charles B. Blair*, of counsel), for appellee.

BIRD, C. J.   Plaintiff brought suit in assumpsit to recover the purchase price of 8 Laramie Municipal District Bonds of $500 each, which he purchased from defendant in April, 1909, on the ground that the purchase was induced by false representations as to their value.   Plaintiff was successful in establishing his claim before the jury, they finding a verdict for him in the sum of $5,285.33.   Subsequently a judgment was entered for defendant by direction of the court, notwithstanding the verdict.   The main question discussed is whether the trial court was justified in so doing.

1. At the time the parties had their dealings both were residents of Grand Rapids.   Plaintiff was practicing his profession as physician and surgeon, while the defendant held the position of cashier of the City Trust & Savings Bank.   Plaintiff claims that, by invitation of the defendant, he visited the bank on April 8, 1909, and when he arrived there he found that defendant wanted to talk with him about purchasing some irrigation bonds.   Referring to the false representations, plaintiff testified in substance that defendant said to him:

"You have a certificate of deposit here for $3,000, drawing 3%.   I have got some bonds as good as government bonds, drawing 6% interest that I want to sell you.   They are bonds of the Laramie Valley Municipal Irrigation District of Wyoming.   They are municipal bonds, the same as municipal bonds in a city, such as sewer taxes and improvements.   The government built this irrigation project in Wyoming and then turned it over to the district and the district has issued these bonds, and they are a first lien on everything, including all the land and all of the irrigation

project. I have been out there and have been all over this project (here defendant brought out 7 or 8 loose leaf productions of photographs of harvest scenes and growing crops, such as would only be seen on exceptionally fertile soil), defendant then said: I have seen those conditions and those pictures were taken while I was there, and I can vouch for their correctness. I have seen the James Lake System, and it is all completed, and in use. The land in this irrigation district is selling from eighty to one hundred dollars an acre. Everything is completed and in use. The land is all under irrigation in this district and improved, everything is all settled and all under cultivation, all prosperous farmers. The bonds, being a first lien on all of this valuable improved land and irrigation system, are very valuable and, therefore, are selling above par, at 101."

Plaintiff testified that relying on defendant's representations concerning the bonds and the security behind them, he purchased eight $500 bonds; that defendant computed the interest due him on the certificate of deposit, that he then went to his place of business, secured a check from his brother for the balance, came back and delivered the same to defendant and the defendant delivered to him the bonds, after which he redelivered them to defendant as collateral security for the loan, in place of the certificate of deposit, and took a receipt therefor.

Defendant's version of what took place is in serious conflict with plaintiff's version on many of the material matters. It is the claim of defendant that he himself did not own any of the bonds. He admits having an interview with plaintiff concerning the purchase of the bonds, but denies that he sought it. His version is that it came about by the suggestion of Mr. Sibley, the father-in-law of plaintiff's brother, and that his first interview with plaintiff took place on the 7th of April, upon which date the plaintiff signed an order for the bonds, directed to Child, Hulswit & Company, brokers

of Grand Rapids; that the order was handed over by him to that company, and in pursuance of said order the bonds were ordered from Chicago and delivered to him the next day, April 8th, and that later in the day he delivered them to the plaintiff. He further testified that he received nothing as commission for bringing about the sale.

Plaintiff introduced testimony tending to show that certain material representations made by defendant with reference to the security and value of the bonds were untrue, but we need not dwell upon that phase of the case as defendant conceded that if the claimed representations were made by him they were untrue.

The principal defense was that even if the statements were made as testified to by plaintiff they were not admissible in evidence by reason of the statute of frauds, which provides that:

"No action shall be brought to charge any person, upon or by reason of any favorable representation or assurance, made concerning the character, conduct, credit, ability, trade or dealings of any other person, unless such representation or assurance be made in writing, and signed by the party to be charged thereby, or by some person thereunto by him lawfully authorized." 3 Comp. Laws 1915, § 11983.

Plaintiff meets this defense by the assertion that the statute does not apply when the property about which the representations were made belonged to the one making the representations, nor when the party making the representations profits by the transaction.

Defendant does not seriously dispute this, but he insists that there is no competent proof that he was the owner of the bonds; neither is there any proof that he profited by the transaction, but on the other hand there is positive proof that he did not own the bonds and that he did not profit by the sale of the bonds; and it is argued that, with these representa-

207—Mich.—15.

tions eliminated by the statute, there is nothing left of plaintiff's case.

We think it is clear that if defendant were the owner of the bonds or profited by the transaction, the statute does not apply. In construing this statute, Mr. Justice CAMPBELL said:

"The legal provision concerning the necessity of representations in writing to sustain an action upon favorable assurances concerning the character, conduct, ability, trade or dealings of another person, was intended to reach cases where the plaintiff has dealt with and given credit to the person favorably mentioned, and done so on the faith of the assurances. That statute cannot apply to conspiracies or frauds, where the representation is made to enable the party making it to profit by it." *Hess* v. *Culver*, 77 Mich. 598 (6 L. R. A. 498, 18 Am. St. Rep. 421).

And this construction was later approved in the case of *Massey* v. *Luce*, 158 Mich. 133. The material questions, therefore, to be determined are:

(*a*) Was the question of defendant's ownership of the bonds one for the jury?

(*b*) Does the record show that defendant profited by the transaction?

*a.* Was defendant's ownership of the bonds an issue for the jury? The plaintiff testified that defendant represented that he was the owner of the bonds, and that he delivered them to him. Mr. Sibley's testimony tends to corroborate plaintiff's testimony in this respect. Defendant denied that he owned the bonds and denied that he so represented to plaintiff. He claims plaintiff signed an order, addressed to Child, Hulswit & Company, for the bonds, and claims that he read it to plaintiff in Sibley's presence. Both Burleson and Sibley deny this, and plaintiff denies that he signed the order. The question as to whether the signature to the order was the genuine signature of the doctor

was much controverted. Several business people and experts gave it as their opinion that it was the genuine signature of the doctor. One expert thought it was not. The twelve jurors who examined it concluded it was not the doctor's signature, and they answered a special question propounded by defendant that it was not the doctor's signature.

While the testimony of defendant as to his ownership of the bonds and as to the signature of the doctor is quite convincing, we do not feel that it is within the province of this court to say that the positive testimony of Dr. Burleson, the corroborating evidence of Mr. Sibley, the opinion of Mr. Patterson, the expert, and the ocular inspection by twelve jurors in connection with the other testimony in the case did not make an issue of fact. We are of the opinion that the trial court was in error in holding that as between the parties there was no proof to go to the jury on the question of defendant's ownership of the bonds.

b. We are also of the opinion that, under the uncontradicted testimony, the defendant did profit by the transaction to such an extent that the provisions of the statute do not apply. When the defendant made the sale to plaintiff he was not only a stockholder of Child, Hulswit & Company, but had an arrangement with that company to become its treasurer and director and take charge of the sale of irrigation bonds, and within 10 days after the sale he was elected director and treasurer of the company, with an advance of salary over what he was receiving as cashier of $1,600, and on May 1st he assumed these duties. When the sale was made he had already resigned his position in the bank. On April 8th he and Mr. Child had just returned from a trip to Denver to inspect the irrigation projects in that vicinity which had issued, or was about to issue, bonds. On this trip defendant was the guest of, and his expenses were paid by, Trowbridge

& Niver, Chicago brokers, who were handling these irrigation issues. The following excerpts taken from the testimony of defendant Blair tend to show his interest in his future employer:

"When I went to Denver I knew I was going to quit the bank, and I knew at that time that I was going with Child, Hulswit & Company, and so at the invitation of Trowbridge & Niver, I went west and took Mr. Child with me. That was the last week in March, 1909, and I was going to engage in the sale of irrigation bonds if the project looked good to me. I was going for the purpose of making a personal investigation of the Denver-Greeley projects and the other two projects for Child, Hulswit & Company. I was going to be the active man in charge, I was going to be the bond man. I wanted to go out there and satisfy myself that all was well. * * * The reason they took us out there was to close the deal with us so we would take on the sale of the bonds. That was the understanding. * * *

"Q. Witness, you have said on direct examination, didn't you, that you went out there for the purpose of preparing yourself on the sale of these bonds?

"A. That, and to see whether I wanted to enter into it as Trowbridge & Niver had suggested our doing. After resigning from the bank I had an understanding with Child, Hulswit & Company that I was to go out west. Then it was all arranged before I went west except the formal meeting electing me director and treasurer."

Mr. Child, of Child, Hulswit & Company, referring to the $4,000 of bonds sold to plaintiff, testified, upon cross-examination, as follows:

"Q. Do you recall personally of this order coming in there on the 7th of April?

"A. Yes, I do.

"Q. It was quite a shock to you to get an order like that unsolicited.

"A. It was not a shock.

"Q. A surprise?

"A. No, it was a pleasant thing to have come in,

because it was one of the first sales, a sale of any amount of irrigation bonds, and naturally I noticed it.

"*Q.* You learned a little later on—in fact you learned from a letter—that it did come through the instrumentality of Hugh Blair?

"*A.* Yes, sir. I saw the City Trust & Saving Bank on there and I saw it was his handwriting. Prior to that time Hugh Blair and I had been out west to look over the irrigation projects. That was about the latter part of March, 1909. At that time we were contemplating taking on the sale of irrigation bonds in addition to other bonds. We were contemplating putting Hugh Blair in charge of that field.

"*Q.* You were a little bit pleased to know Hugh Blair on this day had sold the highest amount of irrigation bonds that had ever been sold by your firm?

"*A.* Yes; I was pleased to get the order, naturally.

"*Q.* You were so pleased that you made considerable commission out of it?

"*A.* I do not see that that has anything particular to do with the pleasure.

"*Q.* You were in the business for the money you made?

"*A.* Yes, we were, surely. The profit on the sale of $4,000 of bonds, that profit would not be sufficient to give any great amount of pleasure. The fact, as stated before, we were expecting Mr. Blair was coming with us, this was an indication to me—that—

"*Q.* He would make good?

"*A.* Yes, and possibly this, that he knew people who could buy bonds. * * *

"*Q.* During that month, when he was still in the bank, whenever he would send you any of these customers he did it purely out of personal motives, I suppose, because he was a friend of yours?

"*A.* Sure, because he was planning then to come with us, and he wanted to do anything he could to develop the business, naturally. I think he was elected director and officer of our association about the 17th of April, 1909.

"*Q.* Prior to that time you had concluded by reason of the fact that you elected him to this position to handle your bonds, you had concluded that he had demonstrated his ability to make good, hadn't you?

"*A.* Well, I would not exactly say that. We felt he could make good, but I think it would be rather a difficult thing for a man in making a few sales of bonds to demonstrate that he could make good."

Later, on direct-examination, the witness testified:

"When I replied to Mr. Herman, that I felt, when Mr. Blair came with our company he could make good, I meant by that, that he would be able to sell and negotiate the sale of securities in such amounts as would make it worth while to have him associated with our association, that is, that he would develop ability in that regard and command the confidence of the community."

Occupying the position that Mr. Blair did during this transaction, can it be said that he did not profit by the sale of the bonds, which netted a commission of $240 to Child, Hulswit & Company, because that company did not hand him a check for two per cent., or some other reasonable amount, as commission? Does anyone believe that Mr. Blair would have sold these, and other bonds, netting the company a commission of $1,334 without compensation, if there had been no arrangement for him to ally himself with that company in less than 30 days thereafter? Men who work for a living are not ordinarily as liberal as that. It is not unusual for men to grow liberal when they have some ulterior purpose to serve. Blair was reaching for a position and for an advance in salary, which had not yet been fixed. He was trying to convince Child, Hulswit & Company that he was the man they were after, that he could make good, and instead of accepting the check for his proportion of the commission of the sales he waived it in order to secure something of more importance. During the days when these sales were made Mr. Blair manifested the same interest in Child, Hulswit & Company that he did afterward when he became a part of it. He admits that he did the same work afterwards as before. He

demonstrated his fitness for the position and succeeded in getting what he was after.

It is also worthy of comment that plaintiff did not seek defendant and solicit information concerning the credit and ability, etc., of the Laramie irrigation district, as is usually the case when this statute is invoked, but Blair sought plaintiff, knowing he had money on deposit in the trust company. He tried to reach him through Mr. Sibley. Failing in this, he communicated directly with him. After he reached him, he deliberately advised him to withdraw deposits from the bank he, himself, was paid to serve and invest it in bonds from which Child, Hulswit & Company, his future employer, would reap a commission of $240. This evinces his eagerness to please Child, Hulswit & Company, and to demonstrate his fitness for the position he was about to fill. In this he succeeded, and in his success he found his compensation. By refusing to make a direct charge for services which are ordinarily compensated, for the purpose of capitalizing it in another direction, he cannot be heard to say that he received no profit from the transaction.

The judgment for defendant must be vacated and judgment entered for plaintiff on the verdict of the jury.

MOORE, STEERE, BROOKE, FELLOWS, STONE, and KUHN, JJ., concurred.

The late Justice OSTRANDER took no part in this decision.

## ON MOTION FOR REHEARING.

On denial of a motion for rehearing, the order was modified to remand with directions to enter judgment on the verdict with leave to renew motion for new trial if desired.